# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2024-0991-LWW |
| CX360, INC. f/k/a INTRADO INTERACTIVE SERVICES CORPORATION, | ) ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: December 18, 2024
Date Decided: December 31, 2024

Susan W. Waesco, Thomas P. Will, Courtney Kurz & Taylor A. Christensen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Counsel for Plaintiff Comcast Cable Communications Management, LLC*

Matthew F. Davis, David A. Seal, Callan R. Jackson & Adriane M. Kappauf, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; J. David Cabello & Stephanie E. Holden, CABELLO HALL ZINDA, PLLC, Houston, Texas; Ari M. Berman & John R. Van Son, PILLSBURY WINTHROP SHAW PITTMAN LLP, New York, New York; *Counsel for Defendant CX360, Inc. f/k/a Intrado Interactive Services Corporation*

**WILL, Vice Chancellor**

This case concerns a contentious business divorce between Comcast Cable Communications Management, LLC and its longtime customer service provider, CX360, Inc. After a ten-year partnership, Comcast decided not to renew the parties' master services agreement. It expected CX360 to provide services on terms favorable to Comcast while Comcast transitioned to a new vendor. To gain leverage in negotiating a transition arrangement, CX360 invoked its contractual right to terminate the master services agreement.

Comcast brought suit against CX360. It maintains that CX360 lacks a termination right. Alternatively, it asks that the master services agreement be reformed or CX360 be found to have breached the implied covenant of good faith and fair dealing. After an expedited trial, I conclude that these claims lack merit.

The master services agreement grants each party the right to terminate for convenience. The provision was proposed by CX360 and survived multiple rounds of negotiations. The final agreement with the bilateral termination right was approved by several layers of Comcast employees, including in-house counsel and top executives. It was reaffirmed over a decade of renewals. Neither its belief that the language was a mistake nor the implied covenant give Comcast an out.

## I. FACTUAL BACKGROUND

Unless otherwise noted, the following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1]

### A. Comcast's IVR

Plaintiff Comcast Cable Communications Management, LLC is a Delaware limited liability company with its principal place of business in Philadelphia, Pennsylvania.[2] Comcast is one of the largest providers of video, high-speed internet, and phone services in the United States. It delivers broadband, wireless, video, and voice services to tens of millions of residential and business customers.[3]

Defendant CX360, Inc. is a Delaware corporation with its principal place of business in Omaha, Nebraska.[4] CX360 is a technology provider. It is a subsidiary of West Technology Group, LLC—an entity controlled by affiliates of funds managed by Apollo Global Management, Inc.[5] CX360 is the successor-in-interest

---

[1] Joint Pre-trial Stipulation and Order (Dkt. 91) ("PTO"). The trial record includes 305 joint exhibits, 19 deposition transcripts, and 3 days of live testimony from 10 fact witnesses. *See* Trial Tr. (Dkts. 127-32). Trial testimony is cited as "[Name] Tr." Facts drawn from exhibits jointly submitted by the parties are referred to according to the numbers provided on the parties' joint exhibit list and cited as "JX __" unless otherwise defined. *See* Joint Ex. List (Dkt. 94). Deposition transcripts are cited as "[Name] Dep."

[2] PTO ¶ 7.

[3] *Id.*

[4] *Id.* ¶ 8.

[5] *Id.*

to Intrado Interactive Services Corporation, formerly known as West Interactive Corporation.[6]

CX360 has provided interactive voice response ("IVR") services to Comcast since 2003.[7] IVR is an automated telephone system technology that enables callers to provide or receive information without speaking to a live agent. Callers use speech recognition or touchtone keypads to select menu options, which rout the call to responsive information or the appropriate agent.[8] This technology can improve call flow and reduce overall wait times.[9] In some cases, IVR allows callers to resolve issues without the assistance of a live agent.[10]

For Comcast, IVR acts as the "gateway" for callers who dial "1-800-Xfinity."[11] Comcast initially managed its IVR services in a decentralized way, with different providers servicing separate geographic "divisions" of Comcast's business.[12] CX360 provided IVR services to Comcast's West division.[13]

---

[6] *Id.* Certain documents at issue in this case were executed by predecessor entities of CX360. For simplicity, I refer to the entities collectively as CX360.

[7] JX 1 (2003 services agreement).

[8] PTO ¶ 9.

[9] *Id.* ¶ 10; *see also* Karinshak Tr. 773.

[10] Frazier Tr. 139-40; Truong Tr. 406-07.

[11] Bradshaw Tr. 169; *see also* Truong Tr. 403; Karinshak Tr. 762.

[12] Stowell Tr. 12.

[13] Karishnak Dep. 12-13; PTO ¶ 12.

## B.	The 2013 RFP

In 2013, Comcast decided to switch to an enterprise-based IVR solution across divisions.[14] It issued a request for proposal ("RFP") soliciting bids from IVR service providers.[15] CX360 was eager for an opportunity to grow its relationship with Comcast and submitted a bid.[16]

Comcast's RFP application included a draft services agreement.[17] The application stated that "[a]ny requested changes to the contract w[ould] be closely evaluated by Comcast" and that "[c]hanges deemed unacceptable by Comcast may eliminate [b]idders from consideration."[18] It further noted that "[c]hanges not included in [the b]idder's RFP response submission [would] not be considered by Comcast in the final contract negotiations."[19]

In its RFP application submitted on October 15, 2013, CX360 included a redline showing its proposed changes to Comcast's form services agreement.[20]

---

[14] Stowell Tr. 19.

[15] PTO ¶ 11.

[16] JX 14; *see also* Wulfraat Dep. 28.

[17] JX 13.

[18] JX 17 at 1; *see also id.* at 18 ("The License and Master Services Agreement will substantially be in the form of the attached agreement in Section 4.3. It is expected that [b]idders will agree to the terms and conditions in the agreement. Please list all of your exceptions to the MSA and/or SOW and requests for changes in Section 4.3 of this RFP.").

[19] JX 17 at 1.

[20] *See generally id.*; JX 3 (redline of Comcast form contract).

4

Section 3 of Schedule A ("Schedule A.3") to Comcast's form allowed Comcast to terminate the agreement for convenience.[21] The form stated that "Comcast may, at its election, terminate this [a]greement and/or any [statement of work] without cause on ninety (90) days written notice to Vendor."[22] CX360 struck "Comcast" from the beginning of that sentence and replaced it with "[e]ither party."[23] The sentence as CX360 revised it read: "Either party may, at its election, terminate this Agreement and/or any SOW without cause on ninety (90) days written notice to Vendor."[24] "Vendor" was defined as West Interactive (i.e., CX360).[25]

### C. The Services Agreement Negotiations

CX360 won the RFP process.[26] The parties went on to negotiate a services agreement. For Comcast, negotiations were led by Thomas Stowell, then a member of Comcast's procurement department responsible for call center and telecommunications contracts.[27] CX360's negotiating lead was Peter Wulfraat, then

---

[21] JX 13 at 27.

[22] *Id.*

[23] JX 3 at 27.

[24] *Id.*

[25] Although CX360's initial redline included this language, it was not until the next draft (exchanged on February 21) that the parties proposed referring to West Interactive Corp.— i.e., CX360—as "Vendor" throughout the document. *See* JX 4 at 1 (proposing this change).

[26] PTO ¶ 12.

[27] Kiriacoulacos Tr. 110; Stowell Tr. 21-22; Wulfraat Tr. 705; *see also* PTO ¶ 49 (describing Stowell's background).

a CX360 account executive.[28]  The parties' respective in-house counsel were also involved.[29]

The parties met on January 28, 2014 to discuss contract terms.[30]  They exchanged draft agreements on February 21 and April 8.[31]  The February 21 draft included a comment to Schedule A.3, flagging a "[f]ew typos."[32]  The same version highlighted an error in the final sentence of the provision about the termination fee.[33]

In an April 16 markup, Comcast accepted CX360's prior change to Schedule A.3, which struck "Comcast" and replaced it with "[e]ither party."[34]  Comcast also edited the text to say "Either Party" with a capital "P."[35]  The term "Party" was defined as Comcast or West Interactive (i.e., CX360).[36]  Comcast fixed two other

---

[28] Wulfraat Tr. 705; *see also* PTO ¶ 43 (describing Wulfraat's background).

[29] Stowell Tr. 58; Wulfraat Tr. 705-06.

[30] JX 21 at 1.

[31] JX 4 (February 21 draft); JX 26 (April 16 redline to April 8 draft).

[32] JX 4 at 29.  At trial, Stowell testified that CX360 made these comments.  *See* Stowell Tr. 29; *but see* Wulfraat Tr. 724-25 (testifying that he could not recall who made the comments).  Some of the comments seem more likely to have come from Comcast, however.  And the filename included the initials "ts," which Stowell would add when naming documents he prepared.  JX 4 (file name: "License and Master Services Agreement 02 21 2014ts Draft V1.doc"); Stowell Tr. 52.  Regardless of who made the comments, Comcast had the opportunity to review them.  *See* Stowell Tr. 52.

[33] JX 4 at 29.

[34] *See* JX 26 at 28.

[35] *Compare id.* (revised language), *with* JX 4 at 29 (prior language).

[36] *See* JX 26 at 1.

typos in Schedule A.3: "Comcast exercise" became "Comcast exercises," and "2nd party" became "Vendor" throughout the provision.[37] After this point, neither party made any further edits to Schedule A.3.[38]

The draft services agreement was reviewed by Comcast's procurement, business, and legal teams.[39] It also went to Comcast's senior executives. For a deal of this size, Comcast's internal policies required that six executives—including its Chief Executive Officer and Chief Financial Officer—approve the agreement.[40]

Stowell prepared an approval package for the executive team with a two-page memorandum summarizing the agreement's key terms.[41] The memorandum identified "[t]ermination for convenience with a declining fee within the first 12 months and no fee after the initial 12 months of the agreement" as a "Highlighted Commercial Term[]."[42] It did not state that the termination right only belonged to Comcast.[43]

---

[37] *Id.* at 28.

[38] *Compare* JX 31 (final "MSA") at 28, *with* JX 26 at 28.

[39] *See* Stowell Tr. 33, 60-61.

[40] JX 30 at 3.

[41] Stowell Tr. 33. Although the memorandum was nominally "from Peter Kiriacoulacos," Stowell prepared the memo. Stowell Tr. 34-35; Kiriacoulacos Tr. 101; *see also infra* notes 47-48 and accompanying text (describing Kiriacoulacos's role).

[42] JX 30 at 2.

[43] *Id.*

A signature page followed the two-page memorandum.[44] It contained a "[b]rief [s]ummary of the [c]ontract [a]ttached," which again generally described the termination right for convenience without identifying it as exclusive to either party.[45] Comcast's President, CFO, Senior Vice President of Finance, and Senior Vice President of Strategic Business Procurement each signed the page.[46] It was also signed by Comcast's Executive Vice President and Chief Procurement Officer, Peter Kiriacoulacos.[47]

## D.  The MSA and its Amendments

On July 21, 2014, Kiriacoulacos executed the final Master Services Agreement (the "MSA").[48] He viewed the MSA as a "very critical contract."[49] Yet, he did not read the MSA before signing it.[50] He relied on Stowell's memorandum and discussions with his team to understand the MSA's terms.[51]

---

[44] *Id.* at 3.

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] MSA 23.  The effective date was February 18, reflecting that CX360 had begun developing the enterprise-wide platform concurrently with service agreement negotiations. PTO ¶¶ 2, 12; Stowell Tr. 73.

[49] Kiriacoulacos Tr. 120-21.

[50] *Id.* at 90, 95.

[51] *Id.* at 99-100, 112.

The MSA had a three-year term.[52]  Over the next decade, the parties agreed to extend the MSA's term at least eight times.[53]  Kiriacoulacos executed most of the amendments; he read none.[54]

The most recent amendment was executed on March 2, 2022.  By its terms, it terminates on February 28, 2025.[55]

Each of the amended MSAs maintain the same language in Schedule A.3 as the original version.[56]

### E.    The Parties' Commercial Relationship

The MSA created a favorable commercial arrangement for both parties.  By 2023, Comcast made up at least 29% of CX360's total revenues and 54% of its annual profits.[57]  CX360 also became "deeply woven" into Comcast's customer

---

[52] PTO ¶ 13.

[53] *Id.* ¶¶ 13-22; *see* JX 33 (Amendment No. 1); JX 36 (Amendment No. 3); JX 37 (Amendment No. 4); JX 39 (Amendment No. 5); JX 42 (Amendment No. 6); JX 46 (Amendment No. 7); JX 47 (Amendment No. 8); JX 56 (Amendment No. 10).  There was no "Amendment No. 9." *See* Stowell Tr. 42.

[54] Kiriacoulacos Tr. 103.  Amendment No. 1 to the MSA was executed by a different executive and the version of Amendment No. 8 in the trial record is unsigned.  JX 3 at 3; JX 47 at 3.  All other amendments bear Kiriacoulacos's signature.

[55] JX 56 at 1, 7.

[56] Stowell Tr. 75-76 (noting that the provision "never was really revisited").

[57] *See* JX 231 at 17; Kilzer Dep. 81.

service platform, working iteratively with Comcast to adapt its IVR services to Comcast's needs.[58]

A significant portion of Comcast's customer service was provided through CX360's IVR. Comcast has approximately 32 million residential customers that have hundreds of millions of interactions with Comcast's customer service each year.[59] About 84% of these interactions are digital (rather than human-assisted), and 33% of residential customers have digital interactions with Comcast through IVR.[60] Comcast credited CX360 with its ability to effectively service this large customer base using fewer call agents.[61]

The system suffered a setback on December 1, 2022 when West was the victim of a malware attack, causing an IVR service outage for Comcast.[62] For a few hours after the attack, Comcast's customers could not reach support services by

---

[58] Jones Tr. 540-41 ("We had a 20-year behemoth of a development that had been built incrementally over all [the years of working together]. There were lots of complexities. We were very deeply woven into . . . complex business processes inside of Comcast."); *see also* Bradshaw Tr. 168-69.

[59] Bradshaw Tr. 167-68.

[60] Aff. of Rhona Bradshaw in Supp. of Pl. Comcast Cable Commc'ns Mgmt., LLC's Mot. to Expedite and for Entry of Status Quo Order (Dkt. 1) ¶ 5; Bradshaw Tr. 167-68.

[61] *See* Karinshak Tr. 764-65 (calling CX360 a "fantastic partner" and a "critical part" of its customer service platform); Karinshak Dep. 34, 61 (explaining that CX360 was "a very important part of [Comcast's] ecosystem" which helped it to deliver customer service benefits and "achieve many of [its] business objectives").

[62] Frazier Tr. 130; *see also id.* at 141, 147; Rinchiuso Tr. 745; Karinshak Tr. 777.

phone.[63]  Customers could, however, contact Comcast through its app, website, or physical stores.[64]  Comcast quickly deployed an alternative call routing system to bypass the IVR and connect customers directly to call centers.[65]

CX360's IVR services were re-operational within four days.[66]  By December 18, Comcast was "out of disaster recovery mode" and IVR was running at 71% capacity.[67]  Full functionality was restored in mid-January 2023.[68]

### F.    The 2023 RFP

After the outage, CX360 and Comcast worked to migrate IVR services to a new system called MosaicX.  MosaicX utilized Google's cloud platform, speech engine, and artificial intelligence (AI) services.[69]

Concurrently with the service migration, Comcast began drafting a new RFP for its IVR services.[70]  Comcast had two main objectives.  First, it sought a "scal[able] and . . . reliable" IVR solution."[71]  Second, it sought to modernize its

---

[63] Rinchiuso Tr. 745.

[64] Frazier Tr. 129.

[65] Rinchiuso Tr. 746; Frazier Dep. 90; JX 57.

[66] Frazier Tr. 130.

[67] *Id.* at 148-49; JX 57.

[68] Frazier Tr. 149-50.

[69] Rinchiuso Tr. 740-41.

[70] Frazier Dep. 62; Rinchiuso Tr. 740.

[71] Frazier Tr. 154.

11

existing technology with generative AI and "low-code/no-code" capabilities.[72] "Low-code/no-code" technology would allow Comcast employees to make feature changes directly from their computers without relying on CX360 engineers for implementation.[73]

On September 21, 2023, Comcast launched the RFP.[74] It reached out to eleven companies including CX360; ten made bids.[75] CX360 submitted its bid on November 17.[76]

In January 2024, Comcast and CX360 met to discuss CX360's submission.[77] CX360 felt that the meeting went well and that the MSA would be renewed.[78] Comcast, by contrast, felt that CX360 was lagging in its technological development.[79] Comcast asked for "further elaboration and expansion on [CX360's IVR] roadmap."[80]

---

[72] JX 71 §§ 3.3-3.6, 5.1-5.2.

[73] Frazier Tr. 155; Bradshaw 197-98.

[74] JX 71.

[75] JX 233 (letter from Comcast inviting CX360 to respond to the RFP).

[76] JX 72; JX 71; JX 69.

[77] JX 86.

[78] Shlonsky Tr. 634 (noting that he heard good feedback from his team); Jones Tr. 483, 521, 529, 543-44 (recalling that the team "felt very positive coming out of the review in January" and received "very positive feedback from [Comcast's then-Vice President of Digital Platform] Ricky Frazier"); Truong Tr. 428.

[79] Fein Tr. 259; Frazier Tr. 160.

[80] JX 86.

The parties went into a second meeting on April 15 with mismatched expectations. The CEO of West Technology Group, John Shlonsky, felt excited about what he viewed as a probable good outcome.[81] But Comcast's Senior Vice President of Enterprise Procurement Leslie Fein—the primary speaker in the meeting—viewed it as an opportunity to show CX360 that "they were way behind."[82] By the end of the meeting, CX360's attendees felt that Comcast would leave the relationship.[83] Nevertheless, CX360 committed to accelerate its product development roadmap to provide the features Comcast requested.[84]

### G. CX360 Loses the RFP.

On May 24, Comcast told CX360 that it had lost the RFP.[85] Comcast said that it would send CX360 a transition plan within a month.[86] CX360 immediately began

---

[81] Shlonsky Tr. 635; *see also* JX 89 (Shlonsky email to Fein after the April 15 meeting: "Please understand that I had no reason to believe Mosaicx wasn't delivering to Comcast's expectations, so I came to the meeting with the hope that we could focus on the contract, for both 2024 and the extension.").

[82] Fein Tr. 260-61.

[83] *See* Shlonsky Tr. 637; JX 89 (Shlonsky to the CX360 team stating that it was "[a] bit difficult to sit through that meeting" and speculating that "[u]nless [Comcast was] posturing, [he] would say they are going to leave."); JX 90 (CX360's President, Rebecca Jones, telling Comcast "it's now evident that there's a disconnect in supporting your [long-range plan]").

[84] *See* Jones Tr. 534; Truong Tr. 410-11.

[85] PTO ¶ 27; JX 115.

[86] PTO ¶ 28; JX 119; *see also* Kilzer Dep. 147.

considering its options for moving forward.[87]  CX360's goal was to negotiate a mutually satisfactory transition services agreement.[88]

In early June, CX360 learned that Google was the winner of the RFP.[89] CX360 felt "deceived" by this choice.[90]  Google's cloud platform was the "backbone" of CX360's IVR technology on MosaicX.[91]  CX360 became concerned that Comcast and Google would convert the CX360 system built atop Google's platform.[92]

On June 26, Comcast shared its proposed transition terms with CX360.[93] CX360's concerns deepened.  Comcast's proposal would require CX360 to incur substantial costs while surrendering CX360's database and processes for free.[94]

---

[87] JX 116; JX 121.

[88] Truong Tr. 450; Shlonsky Tr. 647.

[89] *See* JX 132; *see also* PTO ¶ 29.

[90] Truong Tr. 435, 462; *see also* Jones Tr. 551, 559.

[91] Truong Tr. 424 (likening CX360 to a painter and Google to "the paint and the canvas"); *see also id.* at 434-35.

[92] JX 133; JX 139; JX 140.

[93] PTO ¶ 30.

[94] JX 141 at 5; *see* Jones Tr. 559 (testifying that Comcast asked for items that "absolutely represent[ed] the value of our company, and they asked for it for free").

CX360 saw this as an effort to "lift and shift" its intellectual property so that Google could replicate what CX360 had taken years to build.[95]

The limited duration of Comcast's proposed transition made matters worse. CX360's typical service agreements had three-year terms with a guaranteed spend over the life of the contract.[96] But Comcast asked for a "transition extension period" through June 30, 2025, during which it wanted "[c]ommercial charges . . . based on usage-based per call volume-based rate tiers with no minimum volume requirements."[97] Comcast also sought the option to extend services after this period on a month-to-month basis as needed.[98] This was problematic for CX360. A brief transition period followed by a month-to-month structure would inhibit CX360's ability to capacity plan and support its fixed costs, particularly because CX360 anticipated significant layoffs after Comcast's non-renewal.[99]

---

[95] JX 184 at 7; Truong Tr. 444; *see also* Shlonsky Tr. 651 ("I was shocked that they wanted us to just transport what we view as . . . our secret sauce and the value of our company over to the very same people that we moved them to from a platform standpoint.").

[96] Wulfraat Dep. 13.

[97] JX 141 at 3.

[98] *Id.*

[99] *See* JX 184 at 7 ("[Comcast has] effectively created the loss of nearly 100 jobs in cascading effect"); JX 196 at 13; Shlonsky Tr. 694-95 (testifying that "somewhere in the vicinity of 125 to 200" CX360 employees would be laid off after Comcast's discontinuation of the relationship, and that "probably 80" layoffs had already occurred); *id*. at 649; Truong Tr. 437-38.

CX360 revisited its options while "staying vague and buying time."[100]  It explored four scenarios.[101]  Scenario 1 was to let the MSA "[r]un [o]ut" and expire by its terms in February 2025, with another 120 days under a transition services agreement and "[m]ax [s]pend of $18.5 [million]."[102]  Scenario 2 was "[w]hat Comcast [w]ant[ed]": for CX360's IVR services to continue until June 2025 with volume-based pricing through December 2025.[103]  Scenario 3 was more favorable to CX360, with a tapered volume and fixed rate agreement until Comcast was off its IVR platform.[104]  Scenario 4—described as the "Nuclear Option"—involved giving "120 Days['] Notice" of termination as soon as possible with a price hike.[105]

CX360 settled on a combination of Scenarios 2 and 3.[106]  It terminated the MSA to "level[] the playing field" and work to negotiate an agreement to cover the transition period Comcast requested.[107]  It did not pursue the "Nuclear Option."[108]

---

[100] JX 155; *see also* JX 158 (CX360's non-response to Comcast follow-up emails); Truong Tr. 468.

[101] JX 131 at 4; JX 123 at 5.

[102] JX 123 at 5.

[103] *Id.*

[104] *Id.*

[105] *Id.*; JX 131 at 4; *see* JX 92.

[106] Truong Tr. 377.

[107] Jones Tr. 562; *see also* Shlonsky Tr. 632-33, 655.

[108] Truong Tr. 377-78 (testifying that internal references to price gouging referred to Scenario 4); Shlonsky Tr. 646.

## H. CX360's Termination

On July 31, CX360 sent Comcast a letter providing "90 days' notice of termination for convenience of the [MSA] pursuant to [Schedule A.3]."[109] The notice stated that the MSA would terminate effective October 31, 2024.[110] The letter attached a summary of proposed transition terms.[111]

CX360 predicted that its termination notice would surprise Comcast.[112] It did not anticipate the intensity Comcast's reaction.[113] Comcast's Fein repeatedly described the termination notice as "a gun to the head."[114] Comcast insisted that CX360 lacked a right to terminate the MSA for convenience.[115]

Two weeks later, CX360 sent a draft "Novation Agreement" to Comcast.[116] The Novation Agreement was intended to replace the performance-based structure of the MSA and better fit the parties' new relationship.[117] Instead of collaboratively

---

[109] JX 174 at 1; *see also* PTO ¶ 32.

[110] JX 174 at 1.

[111] *See id.* at 5.

[112] *See* JX 112; JX 143.

[113] Truong Tr. 395 ("Even though I was expecting there to be some reaction, [Comcast's reaction] was a lot more emotional than I expected.").

[114] JX 196 at 12, 14; Truong Tr. 396; *see also* Fein Dep. 260 (repeating this phrasing); Fein Tr. 326 (same).

[115] JX 180.

[116] PTO ¶ 33; JX 183 ("Novation Agreement").

[117] Shlonsky Tr. 599, 653-54.

developing an IVR platform, they were working to transition the system to another provider.[118] The Novation Agreement would give Comcast time to transition its IVR to Google and reward CX360 for providing transition services.[119]

The Novation Agreement differed from the MSA in several important respects. The Novation Agreement replaced usage-based pricing with a monthly fixed fee of $1,541,000 regardless of the services provided, and introduced a separate payment for "[p]rofessional [s]ervices" previously included free of charge.[120] It contemplated that Comcast would pay a greater sum in advance.[121] It eliminated any right to terminate without cause or for convenience.[122] It would require Comcast to pay the full amount of CX360's fixed fees through December 31, 2025.[123] It suggested a termination fee of up to $21,574,000 (prorated based on the cumulative minimum commitment owed for the remaining term) upon

---

[118] *See* Jones Tr. 560-61.

[119] *See id.* at 576.

[120] Novation Agreement Sched. A, Pricing §§ a-b; *see also* Shlonsky Tr. 665-66 (discussing CX360's rationale for these changes).

[121] Novation Agreement § 11.2.

[122] *Id.* § 12.2.

[123] *Id.* § 12.1

termination of the agreement "for any reason."[124]  And it clarified the definition of what CX360 viewed as its protected intellectual property.[125]

Comcast refused to engage with CX360 on the Novation Agreement.  In late August, Fein described the Novation Agreement as a "non-starter for [Comcast] on many levels."[126]  She demanded that CX360 withdraw its termination notice as a precondition to Comcast's engagement.[127]  CX360 responded with "hope[] that the parties w[ould] be able to successfully work toward reaching an agreement to support a successful agreement for Comcast."[128]

On September 7, Comcast sent CX360 critiques of the Novation Agreement without any counterproposals.[129]  Meanwhile, Comcast prepared to sue.[130]

---

[124] Novation Agreement Sched. A, Minimum Commitment.

[125] Novation Agreement § 1 (defining "Vendor Intellectual Property").  Comcast views this revised definition as an expansion compared to the MSA.  *See* Pl.'s Post-trial Br. 36; Dkt. 1 ¶ 55.  But the definition in the Novation Agreement differed from that in the MSA only insofar as it explicitly included the intellectual property Comcast demanded in its transition proposal.  *See* Dkt. 1 ¶ 55.  Multiple CX360 witnesses expressed the view at trial that this intellectual property belonged to CX360, even under the MSA.  *See supra* notes 94-95 and accompanying text.

[126] JX 192.

[127] Fein Tr. 325-28; *id.* at 342 ("[A]gain, we were trying to get CX360 to come off the novation agreement and rescind their termination."); Jones Tr. 580-81 ("[Fein] told me a number of times that they refused to negotiate at all unless we rescinded the termination."); *see also* JX 180; JX 191.

[128] JX 195

[129] JX 202; *see also* Jones Tr. 581-82.

[130] *See* JX 195; JX 200.

## I.     This Litigation

On September 24, Comcast filed a lawsuit against CX360 in this court.[131]  It advances four counts.  Count I seeks a declaratory judgment that CX360's termination notice is invalid.[132]  Count II is a breach of contract claim, seeking an order that CX360 perform under the MSA through February 28, 2025.[133]  Count III requests reformation of the MSA—changing "Either Party" to "Comcast" in Schedule A.3—based on a mutual mistake theory.[134]  And Count IV is a claim brought in the alternative for breach of the implied covenant of good faith and fair dealing.[135]

On October 3, I granted Comcast's request to set an expedited trial and for a status quo order requiring the parties to temporarily operate under the MSA.[136]  I ordered Comcast to post a bond.[137]  After multiple rounds of submissions from the

---

[131] Verified Compl. for Specific Performance (Dkt. 1).

[132] *Id.* ¶ 68.

[133] *Id.* ¶¶ 72-80.

[134] *Id.* ¶¶ 83-87.

[135] *Id.* ¶¶ 89-94.

[136] Dkt. 16; *see* Dkt. 35.

[137] Dkt. 35 at 46.

parties,[138] I determined that Comcast should post a bond of $5,185,944.[139] Comcast posted this bond on November 26.[140]

A three-day trial was held from December 4 to December 6, 2024.[141] Post-trial briefing was completed on December 18.[142] The parties requested a post-trial decision by December 31.

## II. ANALYSIS

Comcast's primary argument is that CX360 breached the MSA by purporting to terminate it for convenience. It also asserts that Schedule A.3 should be reformed to reflect that CX360 lacks a termination right. In the alternative, it contends that CX360's exercise of a termination right breached the implied covenant of good faith and fair dealing.

Comcast has failed to prove any of these theories by a preponderance of the evidence.[143]

---

[138] Dkts. 33, 48, 52-53.

[139] Letter Op. Regarding Bond (Dkt. 79) 5. This amount is equal to (1) what Comcast would pay CX360 under the MSA through its February 28, 2025 termination date and (2) what Comcast would pay under the proposed Novation Agreement during the same period, plus $1,400,000 million in employee retention costs. *Id.* at 1.

[140] Dkt. 96.

[141] *See* Dkts. 127-32.

[142] *See* JX 133; Def.'s Post-trial Br. (Dkt. 121); Pl.'s Post-trial Br. (Dkt. 123).

[143] *See Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *9 (Del. Ch. Oct. 30, 2015) ("Proof by a preponderance of the evidence means proof that something is more likely than not." (citation omitted)).

## A. Breach of Contract

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) resulting damage to the plaintiff."[144] The parties do not dispute that the MSA is a valid and enforceable contract. Instead, Comcast argues that CX360 lacked a contractual termination right under Schedule A.3 and that, by sending the termination notice, it breached Section 12.1 of the MSA and Section 4 of Amendment 10 to the MSA.[145]

My analysis necessarily begins with the text of the MSA, which is governed by Delaware law.[146] "Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party."[147] "When interpreting a contract, [the] Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement.'"[148] A contract must "be construed in its entirety, and an attempt

---

[144] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

[145] Pl.'s Post-trial Br. 46; *see also* MSA § 12.1 (providing that the MSA has an initial three-year term that may be extended for two years); JX 56 § 4 (amending the MSA's term from March 1, 2022 to February 28, 2025).

[146] MSA § 17.6.

[147] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[148] *Id.* at 368 (quoting *GMG Cap. Invs., LLC v. Athenian P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

should be made to reconcile all of [its] provisions in order to determine the meaning intended to be given to any portion of it."[149]  A court will not look beyond the four corners of an unambiguous contract.[150]

### 1. The First Sentence of Schedule A.3

Schedule A.3 of the MSA begins with: "Either Party, may, at its election, terminate this Agreement and/or any SOW without cause on ninety (90) days written notice to Vendor."[151]  "Either Party" refers to Comcast or CX360.[152]

Comcast maintains that this language is ambiguous.[153]  It seizes on the end of the sentence, which provides for termination upon "written notice *to the Vendor*"—

---

[149] *Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 967 (Del. Ch. 1989) (citation omitted), *aff'd*, 567 A.2d 419 (Del. 1989); *see also GMG Cap.*, 36 A.3d at 779 ("The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."); *Osborn*, 991 A.2d at 1159 (explaining that Delaware courts "will give each provision and term effect, so as not to render any part of the contract mere surplusage" (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 2010 WL 779992, at *2 (Del. Mar. 8, 2010))).

[150] *E.g.*, *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) ("Clear and unambiguous language . . . should be given its ordinary and usual meaning."); *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.").

[151] MSA Sched. A § 3.

[152] MSA 1; *see also supra* note 36 and accompanying text.

[153] Pl.'s Post-trial Br. 47.

i.e., CX360.[154]  Read literally, this provision would require CX360 to notify itself upon termination.

Ambiguity may exist if a provision "is reasonably subject to more than one interpretation."[155]  An interpretation is unreasonable if it "produces an absurd result" or one "that no reasonable person would have accepted when entering the contract."[156]  The court may also reject an interpretation that runs contrary to "[t]he basic business relationship between parties."[157]

It would be absurd to require CX360 to provide notice to itself rather than to Comcast.  This oddity evaded multiple rounds of negotiations.[158]  Still, "sloppy drafting does not necessarily create ambiguity."[159]

Comcast would have me read out the bilateral termination right because of the potential ambiguity over which party was entitled to notice.  But any such ambiguity concerns notice alone—not the substantive termination right afforded to "[e]ither

---

[154] MSA Sched. A § 3 (emphasis added); MSA 1 (defining "Vendor" as CX360's predecessor entity, West Interactive Corp.).

[155] *Matulich v. Aegis Commc'ns Grp., Inc.*, 942 A.2d 596, 600 (Del. 2008) (emphasis omitted).

[156] *Manti Hldgs., LLC v. Authenix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (citing *Osborn*, 991 A.2d at 1160).

[157] *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 927 (Del. 2017).

[158] *See* Wulfraat Tr. 230 (testifying that the language was "worded oddly" and that it was likely the result of "sloppy drafting").

[159] *Roth v. Sotera Health Co.*, 2024 WL 4260649, at *8 (Del. Ch. Sept. 23, 2024).

Party."[160] Comcast's argument that the "notice to the Vendor" language means only Comcast could terminate for convenience would make CX360's bargained-for termination right "illusory or meaningless."[161]

Unlike the "to Vendor" language, which carried over from Comcast's initial form, the "[e]ither Party" language was specifically proposed by CX360 and edited during negotiations.[162] Comcast meticulously reviewed the MSA during the drafting process and multiple times during the next decade when the MSA was renewed.[163] On several occasions, Comcast even highlighted Schedule A.3, showing that it had read and understood the provision.[164]

The text of Schedule A.3 is clear. Comcast or CX360 may terminate the MSA "at its election."[165] Either party need only provide 90 days' notice before such termination can take effect. The only unclear aspect is to whom notice is due.[166]

---

[160] MSA Sched. A § 3.

[161] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001).

[162] *See supra* notes 22, 34-36 and accompanying text.

[163] *See supra* Section I.A.

[164] *See supra* notes 42-45 and accompanying text.

[165] MSA Sched. A § 3.

[166] There is no dispute that Comcast did, in fact, receive notice of CX360's termination.

## 2. The Remainder of Schedule A.3

Comcast next argues that the first sentence of Schedule A.3 is ambiguous in view of the remainder of that section.[167] The full text of Schedule A.3 reads:

> Either Party may, at its election, terminate this Agreement and/or any SOW without cause on ninety (90) days written notice to Vendor. In the event that Comcast exercises its right to terminate for convenience during the first twelve (12) months of this Agreement, Comcast shall pay the following termination fees: (a) if this Agreement is terminated in the first six (6) months after the Effective Date, Comcast shall pay Vendor six million dollars ($6,000,000) within thirty (30) days of such termination; (b) if this Agreement is terminated in months seven (7) through nine (9) after the Effective Date, Comcast shall pay Vendor four million dollars ($4,000,000) within thirty (30) days of such termination; and (c) if this Agreement is terminated in months ten (10) through twelve (12) after the Effective Date, Comcast shall pay Vendor three million dollars ($3,000,000) within thirty (30) days of such termination.
>
> There shall be no Termination Fee for termination of use of the Vendor IVR by Comcast after the 12 Month Pilot Period. For the avoidance of doubt, nothing herein shall be construed to require Comcast to pay any Termination Fee or similar payment with respect to discontinuance of any other components of the License Solution or Services.[168]

Comcast asserts that the "two paragraphs simply do not make sense together."[169] It argues that though the first paragraph contemplates "Comcast will pay a termination fee if it terminates the MSA for convenience in the first year of

---

[167] Pl.'s Post-trial Br. 48-50.

[168] MSA Sched. A § 3.

[169] Pl.'s Post-trial Br. 48.

26

the contract," the second paragraph explains that "there will be no termination fee if Comcast terminates something other than the entire IVR services provided under the MSA."[170] But there is no basis to conclude that the termination for convenience provision in the first paragraph is temporally limited. It continued to apply after the twelve-month pilot period—just without a termination fee.[171]

Comcast also points out that Comcast's right to terminate for convenience is mentioned repeatedly in the section, but CX360's corresponding right is mentioned just once.[172] The comparatively fewer mentions of CX360's right does not, however, make it a meaningless one. CX360's termination right is evident from Schedule A.3's terms.

Comcast further argues that the specific reference to "termination *of Vendor's IVR*" in the second paragraph is superfluous if the parties only intended for Comcast to pay a fee if it terminated the entire MSA.[173] In Comcast's view, the inclusion of this language in Schedule A.3 "casts doubt on whether the parties intended for the

---

[170] *Id.*

[171] Stowell testified that the provision was intended to protect CX360 if Comcast terminated the MSA in the first year because of the substantial initial investment CX360 would need to make to expand its IVR service from a single region to the entire enterprise. *See* Stowell Tr. 20-21, 75-76.

[172] Pl.'s Post-trial Br. 49-50.

[173] *See* MSA Sched. A § 3 (emphasis added); *see* Pl.'s Pre-trial Br. (Dkt. 99) 30.

termination rights set forth in the first paragraph to apply to the MSA as a whole."[174] The text of Schedule A.3 lends no support to this argument. The first paragraph references "this Agreement"—meaning the entire MSA—no less than four times.[175] Comcast's post-trial brief acknowledges that the MSA does not contemplate partial termination.[176]

### 3. The Overall MSA

Comcast also insists that Schedule A.3 is inconsistent with the MSA as a whole.[177] It focuses in particular on Section 12 of the MSA, titled "Term and Termination."[178]

Section 12.1 requires CX360 to give Comcast 120 days' notice before the end of the MSA's current term if it decides not to "renew" the agreement.[179] Section 12.2 provides for a 30-day cure period once a party is notified of a material breach

---

[174] Pl.'s Pre-trial Br. 30. Comcast seems to have abandoned this argument in its post-trial briefing. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."). Stowell also backed away from it in his trial testimony. *See* Stowell Tr. 54 (acknowledging that the first paragraph of Schedule A.3 enables CX360 to terminate the entire MSA). I address the argument here for the sake of completeness.

[175] MSA Sched. A § 3.

[176] Pl.'s Post-trial Br. 49.

[177] *Id.* at 50-53.

[178] MSA § 12.

[179] *Id.* § 12.1 ("Vendor shall notify Comcast at least one hundred twenty (120) days prior to the end of the then-current term if Vendor will not renew this Agreement on the terms and conditions set forth herein . . . .").

and that the non-breaching party may terminate the MSA if the breach is not cured.[180]

And Section 12.3 states that CX360 must provide "reasonable transition services (if requested by Comcast) for a period not to exceed one hundred twenty (120) days after notice of termination" "in the event that either [p]arty gives notice of termination under th[e] [MSA]."[181]

Though they are an awkward fit, the provisions can be read harmoniously such that Section 12 is not in conflict with the bilateral termination for convenience right in Schedule A.3.[182] Sections 12.1, 12.2, and Schedule A.3 contemplate distinct scenarios with different notice periods. Section 12.1 concerns notice of non-renewal, Section 12.2 deals with a cure period for breach, and Schedule A.3 addresses termination for convenience. One section does not override another. "[T]he use of different language in different sections of a contract suggests the

---

[180] *Id.* § 12.2.

[181] *Id.* § 12.3.

[182] *See Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010) (explaining that Delaware courts read contracts in a way "that is reasonable and harmonizes the affected contract provisions"); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012) ("[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously."); *cf. In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 62-63 (Del. 2019) (reading two provisions "in harmony" rather than allowing a narrower provision to "qualif[y]" a broader one).

difference is intentional—i.e., the parties intended for the sections to have different meanings."[183]

Comcast avers that reading Schedule A.3 to grant CX360 a termination right on 90 days' notice is absurd because Comcast would have more time to transition when breaching the MSA than if CX360 terminated for convenience.[184] That is, it reads the transition period afforded by Section 12.3 as applying to Sections 12.1 and 12.2 but not Schedule A.3.

Although the substance of Section 12.3 and its position within the MSA indicate that it most logically relates to a termination under Section 12, it is not expressly limited as such. In CX360's view, the 120-day transition services period set by Section 12.3 applies with equal force to a termination for convenience.[185] Under this interpretation, Section 12.3 can be read in concert with Schedule A.3 such that, if CX360 terminated for convenience, it would need to provide Comcast with

---

[183] *Williams Cos. v. Energy Transfer LP*, 2020 WL 3581095, at *12 n.123 (Del. Ch. July 2, 2020); *cf. MicroStrategy Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, *7 (Del. Ch. Dec. 30, 2010) (observing that the "use of different language in the two sections shows the parties knew how to cover patents beyond the Licensed Patents when that was their intent," which made the absence of such language in the other provision suggest the same coverage was lacking).

[184] Pl.'s Post-trial Br. 50-51.

[185] *See* Def.'s Post-trial Br. 31-32, 32 n.16.

90 days' notice plus 30 days of reasonable transition services (for a total of 120 days of service).[186]

Regardless, even if Comcast were correct that the 120-day transition period pertains to terminations under Section 12, that would mean Comcast failed to negotiate for a fixed transition period if CX360 terminated the MSA for convenience. This oversight provides no legal basis to invalidate the termination right in Schedule A.3. Delaware courts will "not rewrite [a] contract to appease a party who . . . now believes [it] to have been a bad deal."[187]

Comcast also contends that CX360's reading would eviscerate the MSA's purpose of protecting Comcast from cessation of IVR services.[188] There are several provisions in the MSA advancing this end. For example, Section 12.1 requires CX360 to give notice to Comcast upon termination—but not the other way around.[189] Similarly, Section 17.4 permits Comcast to terminate the MSA if CX360 chooses to assign its rights to a competitor and requires CX360 to offer transition services in the interim.[190] That does not mean, though, that the parties agreed the

---

[186] *Id.* at 31.

[187] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

[188] Pl.'s Post-trial Br. 52-53.

[189] MSA § 12.1.

[190] *Id.* § 17.4; *see also id.* § 13.3 (requiring CX360 to provide a copy of its technology and all related documentation with an escrow agent to be released to Comcast in the event of

entire MSA, including Schedule A.3, would only be favorable to Comcast. Nor does it provide grounds to rewrite an otherwise clear bilateral termination right.[191]

## B. Mutual Mistake

Comcast next argues that the first sentence of Schedule A.3 should be reformed because "the parties came to a specific prior understanding . . . that differed materially from the final written MSA."[192] It insists that changing the termination right in Schedule A.3 from unilateral in Comcast's favor to bilateral was inconsistent with the parties' shared understanding.[193] It asks that the sentence be reformed to read: "Comcast may, at its election, terminate this Agreement and/or [] SOW without cause on ninety (90) days written notice to Vendor."[194]

"Mutual mistake occurs when both parties were mistaken as to a material portion of the written agreement, or when both parties are under substantially the same erroneous belief as to the facts."[195] A party seeking to reform a contract due

---

(a) a material breach, (b) cessation of business activities or bankruptcy, or (c) a change of control such that an entity that competes with Comcast can control CX360).

[191] Because Schedule A.3 grants CX360 an unambiguous right to terminate the MSA for convenience, I need not consider extrinsic evidence to ascertain the parties' intent. *See supra* note 150 and accompanying text.

[192] Pl.'s Post-trial Br. 63.

[193] *Id.* at 63-66.

[194] *Id.* at 66.

[195] *CC Fin. LLC v. Wireless Prop.*, *LLC*, 2012 WL 4862337, at *7 (Del. Ch. Oct. 1, 2012) (citation omitted); *see also* Restatement (Second) of Contracts § 155 (Am. L. Inst. 1981).

to mutual mistake must "prove three elements by clear and convincing evidence: (1) that it was mistaken about the terms of the final agreement; (2) that either its counterparty was similarly mistaken or . . . knew of the mistake but remained silent so as to take advantage of the error; and (3) that there was a specific meeting of the minds on a term that was not accurately reflected in the final agreement."[196] Comcast has not met this burden.

On the first element, Stowell credibly testified that he "missed" CX360's change to Schedule A.3.[197] Even so, this change to a material term survived several levels of review by Comcast employees, in-house counsel, and executives.[198] The edit was obvious; Schedule A.3 begins with the phrase "Either Party." The termination right in Schedule A.3 was also specifically called out as a highlighted term in Stowell's summary memo.[199] It is difficult to accept that this term repeatedly evaded the review of multiple experienced and sophisticated individuals at Comcast.

Second, there is no evidence that CX360 was mistaken. It expressed a clear intent to change Schedule A.3 by revising it in the draft agreement submitted to

---

[196] *In re 11 W. P'rs, LLC*, 2019 WL 1300859, at *5 (Del. Ch. Mar. 20, 2018); *see also Cerberus Intern., Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del. 2002); *Joyce v. RCN Corp.*, 2003 WL 21517864, at *4 (Del. Ch. July 1, 2003).

[197] Stowell Tr. 30.

[198] *See supra* notes 39-40, 46-47 and accompanying text; *see also* Stowell Tr. 14-15, 43, 60-61; Kiriacoulacos Tr. 91, 94.

[199] *See supra* note 42 and accompanying text.

Comcast with its 2013 RFP application.[200] The flaw in CX360's implementation—leaving the text that notice be "to Vendor"—does not mean that its inclusion of a bilateral termination right was erroneous.[201] Nor does the record suggest that CX360 knew and took advantage of Comcast's mistake. CX360's change to the first sentence of Schedule A.3 was called out in a redline, flagged in comment bubbles, and edited for typos and to conform defined terms.[202] The "[e]ither party" text remained throughout various versions—including the final executed version.

Comcast's most critical mistake was its failure to closely review the contract. Kiriacoulacos, for example, signed the MSA without reading it due to vast scope of his role.[203] This is understandable for a senior-level executive who signs "hundreds" of contracts a year.[204] But Delaware courts decline to provide parties—especially sophisticated ones—with a pass in such circumstances.[205] "When an experienced

---

[200] *See supra* note 23 and accompanying text; *see also* Wulfraat Tr. 716.

[201] *See Fortis Advisors LLC v. Johnson & Johnson*, 2021 WL 5893997, at \*19 (Del. Ch. Dec. 13, 2021) (rejecting a reformation claim in the absence of an allegation of a "specific meeting of the minds" on the inaccuracy of the final contract language); *Glidepath Ltd. v. Beumer Corp.*, 2018 WL 2670724, at \*12 (Del. Ch. June 4, 2018) (holding that the "doctrine of mutual mistake" did not apply even though the language in the final agreement was "odd and cumbersome").

[202] *See* JX 3; JX 4 at 29; JX 31.

[203] *See* Kiriacoulacos Tr. 90-91.

[204] *Id.*

[205] *See REM OA Hldgs., LLC v. N. Gold Hldgs., LLC*, 2023 WL 6143042, at \*20 (Del. Ch. Sept. 20, 2023) (explaining that a party's failure to read a contract before signing it is not justification to avoid his bargain, particularly where the contracting party is "a

34

party does not bother to read what he knows will be the binding agreement, a court must be exceedingly careful before allowing him to escape the consequences of that agreement, lest the court undercut the reliability of all written contracts, a reliability critical to their important role in facilitating useful commercial relations."[206]

Comcast's reformation claim therefore fails.[207]

## C. Breach of Implied Covenant of Good Faith and Fair Dealing

"[A]n implied covenant of good faith and fair dealing inheres in every contract."[208] It is intended to "ensure[] that the parties deal honestly and fairly with each other when addressing gaps in their agreement."[209] "[T]he covenant is a limited and extraordinary legal remedy" which Delaware courts apply only in "narrow

---

sophisticated businessperson represented by counsel"), *aff'd*, 320 A.3d 237 (Del. 2024) (TABLE); *Harrington Raceway, Inc. v. Vautrin*, 2001 WL 1456873, at *3 (Del. Super. Aug. 31, 2001) ("[T]he Court cannot protect business people who decide to sign contracts . . . without reading them."); *see also Pellaton v. Bank of N.Y.*, 592 A.2d 473, 477 (Del. 1991) (stating that a contracting party must "stand by the words of his contract").

[206] *Parke Bancorp Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 711 (Del. 2019).

[207] *See W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 WL 3247992 (Del. Ch. Oct. 6, 2009) (denying reformation where a counterparty was "entitled to expect [the other party] would read [the agreement] with care"); *JJS, Ltd. v. Steelpoint CP Hldgs., LLC*, 2019 WL 5092896 (Del. Ch. Oct. 11, 2019) ("The fact that Plaintiffs had the opportunity to but did not oppose the various modifications to the LLC Agreements, standing alone, undercuts the argument that their counterparties knew Plaintiffs were mistaken.").

[208] *Chamison v. HealthTrust, Inc.*, 735 A.2d 912, 920 (Del. Ch. 1999), *aff'd*, 748 A.2d 407 (Del. 2000).

[209] *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021).

circumstances."[210] A plaintiff "must allege: (1) a specific obligation implied in the contract; (2) a breach of that obligation; and (3) resulting damages."[211] Implied covenant claims succeed in relatively few "cases where the contract as a whole speaks sufficiently to suggest an obligation and points to a result but does not speak directly enough to provide an explicit answer."[212]

The implied covenant generally arises in two scenarios: (1) as a gap-filler where "a situation has arisen that was unforeseen by the parties" and (2) "when a party to the contract is given discretion to act [and] the discretion has been used in a way that is impliedly proscribed by the contract's express terms."[213] Comcast invokes the second scenario. It argues that the bilateral termination right in Schedule A.3 was discretionary and CX360 exercised it in bad faith.

---

[210] *Nemec*, 991 A.2d at 1128; *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006); *Cincinnati SMSA, Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998) (explaining that application of the implied covenant "should be rare and fact-intensive, turning on issues of compelling fairness").

[211] *Metro Life. Ins. Co. v. Tremont Grp. Hldgs., Inc.*, 2012 WL 6632681, at *15 (Del. Ch. Dec. 20, 2012).

[212] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009); *see also Dieckman v. Regency GP LP*, 155 A.3d 358, 361 (Del. 2017) (noting that the implied contractual terms must be "so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement.").

[213] *Oxbow Carbon & Mineral Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 504 & n.93 (Del. 2019) (cleaned up); *see also Osios LLC v. Tiptree, Inc.*, 2024 WL 2947854, at *5 (Del. Ch. June 12, 2024) ("[Delaware] case law suggests there are two strains of the implied covenant: (1) gap-filling and (2) protecting against arbitrary and bad faith exercise of discretion.").

It is debatable whether the implied covenant should apply here. There is case law arguably supporting both Comcast's position that the implied covenant is implicated because CX360's termination right in Schedule A.3 was discretionary and CX360's position that the implied covenant has no role because the termination right was unrestricted.

In either case, however, Comcast's burden is unmet. The evidence does not support a finding that CX360 acted outside the bounds of good faith when it exercised its termination right.

### 1. Applicability of the Implied Covenant

The implied covenant may constrain a party's exercise of its discretionary right under an agreement.[214] Comcast argues that CX360's right to terminate for convenience is a discretionary one because, rather than being triggered automatically by a specified event, CX360 could choose if and when to exercise it.[215] Delaware

---

[214] *E.g.*, *Miller v. HCP Trumpet Invs., LLC*, 194 A.3d 908 (Del. 2018) (ORDER) ("[T]he mere vesting of 'sole discretion' d[oes] not relieve [a] [party] of its obligation to use that discretion consistently with the implied covenant of good faith and fair dealing."); *Chamison*, 735 A.2d at 921-22 (describing as discretionary a provision in an indemnification agreement giving the indemnitor sole discretion to select counsel for the indemnitee).

[215] Pl.'s Post-trial Br. 71; *see Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2008 WL 4182998, at *8 (Del. Ch. Sept. 11, 2008) ("The implied covenant is particularly important in contracts that endow one party with discretion in performance; i.e., in contracts that defer a decision at the time of contracting and empower one party to make that decision later."); *Cygnus Opp. Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 460-61 (Del. Ch. 2023) ("[In] [t]he absence of any express limitation . . . [t]he LLC Agreement provides the

courts have observed that "[i]f a party with the discretionary power to terminate a contract does so for a 'pretextual'—as opposed to good faith—reason, that can establish a breach of the implied covenant."[216]

CX360 rejects the notion that the termination right is a discretionary one checked by the implied covenant. The Delaware Supreme Court's decision in *Glaxo Group. Ltd. v. DRIT LP* supports this position.[217] There, Glaxo Group Ltd. agreed to make royalty payments to Biogen Idec MA Inc. to resolve certain patent claims.[218] The agreement contemplated that Glaxo's obligation to make royalty payments would cease if Glaxo "disclaimed" the patents.[219] After Biogen assigned its royalties to DRIT LP, Glaxo disclaimed the patent and DRIT sued Glaxo for breach of the implied covenant.[220] DRIT's argument that the implied covenant applied because

---

Board with discretion over which path to take, and the implied covenant requires that the Board exercise that discretion reasonably.").

[216] *Premium Choice Ins. Servs. v. Innovative Fin. Grp. Hldgs., LLC*, 2024 WL 3334917, at *7 (Del. Super. Jul. 9, 2024); *see also Charlotte Broad., LLC v. Davis Broad. of Atlanta, L.L.C.*, 2015 WL 3863245, at *6-7 (Del. Super. Jun. 10, 2015) (describing as discretionary a provision allowing either party to terminate an agreement in its sole discretion if it deemed certain matters unacceptable).

[217] Def.'s Post-trial Br. 56-57 (citing *Glaxo*, 248 A.3d 911).

[218] *Glaxo*, 248 A.3d at 913.

[219] *Id.* at 914.

[220] *Id.* at 915-16.

Glaxo's voluntary disclaimer was "not an event outside the contemplation of the parties" was rejected on appeal.[221]  The court explained:

> It is one thing to imply a good faith obligation when the parties have expressly agreed that a certain act is within a party's discretion.  It is another matter to imply discretion to restrict actions expressly permitted by the parties' agreement. The implied covenant imposes a good faith and fair dealing obligation when a contract confers discretion on a party.  It should not be used to imply terms that modify or negate an unrestricted contractual right authorized by an agreement.[222]

As in *Glaxo*, CX360's action was "expressly permitted by the parties' agreement."[223]  Arguably, then, CX360's motivation for acting is irrelevant.  CX360 bargained for the right to terminate the MSA for any reason and exercised that right.

But even if one could layer the implied covenant onto CX360's termination right in Schedule A.3, Comcast's claim would not succeed.  It has not proven that CX360 acted arbitrarily or in bad faith.

### 2.    Whether CX360 Terminated the MSA in Bad Faith

Comcast argues that CX360's exercise of its termination right was pretextual. In its view, "internal CX360 discussions and communications with Apollo . . . reflect a calculated effort to exert maximum pressure on Comcast to agree to the Novation Agreement's onerous terms and demonstrate a total disregard

---

[221] *Id.* at 920.

[222] *Id.* at 920-21.

[223] *Id.*

for Comcast as a partner."[224] It maintains that CX360 acted in bad faith by coupling its termination with the Novation Agreement, which it describes as "predatory" and "oppressive."[225]

There is no doubt that CX360 decided to play hardball when Comcast announced that it lost the RFP. CX360 was understandably frustrated. After a decade of Comcast being the focal point of its commercial efforts, CX360 was rebuffed in favor of Google—its own commercial partner.[226] CX360 stood to lose its biggest customer and a crucial source of revenue, with substantial layoffs to follow.[227] By terminating the MSA, CX360 sought to gain leverage to secure some commercial upside in the face of Comcast's "one-sided" transition proposal.[228]

CX360 acknowledges that its goal in terminating the MSA was to compel Comcast to negotiate more favorable transition terms—ones that did not require a "lift and shift" of CX360's intellectual property to Google.[229] But CX360 opted not

---

[224] Pl.'s Post-trial Br. 74.

[225] *Id.* at 3, 39, 77, 79.

[226] *See supra* notes 90-92 and accompanying text.

[227] *See supra* notes 57, 99 and accompanying text.

[228] Shlonsky Tr. 649 (recounting Comcast's approach as "I think it's going to be June; it may be longer than that [that CX360 needed to provide services] . . . and I'm going to pay you what I want to pay you" and describing this approach as "obnoxious.," "heavy-handed," and "one-sided"); *see supra* note 107 and accompanying text.

[229] *See supra* note 95 and accompanying text; *see also* Shlonsky Tr. 655-56 (explaining that the termination notice was a means of "creat[ing] a level playing field" on which to continue negotiating).

to pursue the "Nuclear Option" explored in its internal documents.[230] Nor did it intend to turn off its IVR and leave Comcast without effective customer phone support.[231] Instead, CX360 made a proposal that would give Comcast time to transition the IVR services while making the process more beneficial for CX360.[232]

The parties' relationship was set to change significantly after Comcast decided not to renew the MSA. CX360 reasonably concluded that the MSA's performance-based structure no longer made commercial sense.[233] The Novation Agreement disproportionately favored CX360—but it was an opening offer. Rather than make a counterproposal, Comcast likewise took an aggressive approach and demanded that CX360 rescind the termination notice before it would negotiate.[234] Comcast then sued.

---

[230] *See supra* note 108 and accompany text.

[231] Jones Tr. 560, 577 (noting that she "never intended to turn off the IVR" and "fully expected . . . to continue to negotiate to some middle ground that worked best for both parties"); Truong Tr. 451 ("We had no intention of actually turning [the IVR] off. The point . . . was to solicit a conversation.").

[232] *See supra* notes 100-106 and accompanying text; JX 116; JX 131; Jones Tr. 570; Shlonsky Tr. 667.

[233] *See supra* note 117 and accompanying text.

[234] *See supra* note 127 and accompanying text.

Comcast cites no precedent for the premise that invoking an unqualified termination right to gain negotiating leverage violates the implied covenant.[235] It relies on *P.C. Connection, Inc. v. Synygy Ltd.*, where the Court of Chancery enjoined a licensor from terminating a licensee's access to software the licensee depended on and "attempt[ing] to use its resulting leverage to extract unfair terms from [the licensee]."[236] But unlike CX360, the licensor in *P.C. Connection* lacked the contractual right to terminate for convenience.[237] The parties in *P.C. Connection* possessed only the right to terminate "for cause upon 30 days written notice to the other party of a material breach" with the ability to cure.[238]

The evidence demonstrates that CX360 acted to protect its commercial interests after Comcast sent a heavy-handed transition proposal. The parties were

---

[235] *Cf. Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004) (rejecting a plaintiffs' claim that the implied covenant was violated where to apply it would "narrow[] the contractual freedom left to the other parties").

[236] 2021 WL 57016, at *20-21 (Del. Ch. Jan. 7, 2021); *see also P.C. Connection, Inc. v. Synygy Ltd.*, 2021 WL 1943350 (Del. Ch. May 11, 2021) (granting a partial default judgment). The other case Comcast relies on applies Maryland law. *See* Pl.'s Pre-trial Br. 52 (noting that the Court of Appeals of Maryland found "an implied covenant applied to a discretionary right to terminate for convenience to [']prohibit[] the terminating party from yanking out arbitrarily the carpet from underneath the agreement'" (citing *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 674 (Md. 2009))).

[237] *P.C. Connection*, 2021 WL 57016, at *2-5 (outlining the parties' agreements).

[238] *Id.* at *2. This right is roughly analogous to the right afforded both parties in MSA § 12.2. *Compare id.*, *with* MSA § 12.2.

(and remain) engaged in an ugly business divorce. Comcast did not prove that CX360 exercised its unrestricted termination right arbitrarily or in bad faith.

## III. CONCLUSION

Judgment on Counts I through IV is in CX360's favor. Entry of a final order must await the resolution of CX360's motion to increase the bond amount and forthcoming request for damages incurred because of the status quo order.